## CHARLES HOUTZ v. BERTHA HELLMAN, Appellant.

### Division One, May 31, 1910.

1. **DEMURRER: Overruling not Assigned in Motion.** A demurrer is a part of the record proper, and needs no term or final bill of exceptions to preserve it, and the ruling on the demurrer has no place in the motion for a new trial, but having been overruled at the trial may be reviewed on appeal though not made a ground for a new trial in the motion.

Houtz v. Hellman.

2. ———: To Answer: Overruling Not Assigned in Motion: Nor on Appeal: Waiver. Whether or not a defendant, when a demurrer to certain defenses in her answer was filed and sustained, charging that they do not state facts sufficient to constitute a defense to plaintiff's cause of action, waived the right to have that issue determined on her appeal, by subsequently filing an amended answer, is discussed in the opinion, but not decided because the appealing defendant, entitled to raise the point, declines to do so, either in her assignments of error or in her brief.

3. SPECIFIC PERFORMANCE: Ability to Perform. The ability of the pretended purchaser to perform, through a loan or through a temporary advancement of the purchase price by the company for whom he was acting when the contract of purchase was made, is not decisive of said purchaser's right to specific performance.

4. ———: Purchaser's Signature Attached by Another: Ratification. Where the plaintiff's signature as purchaser was attached to the contract of purchase and sale by an undisclosed company, and the owner, or the owner's agent, accepted the contract relying upon its genuineness, plaintiff is not entitled to specific performance; nor is it any answer to the issue of lack of mutuality to say that the plaintiff, by suing on the contract, ratified and became bound by it, for the seller had the right to know from the first that the party to be charged had signed the contract, not upon a mere possibility of being able to prove that the fictitious signature was authorized or the contract ratified.

5. ———: ———: Clean Hands: Not Pleaded. The rule that a purchaser who comes into court asking specific performance of a contract to purchase land, which is a matter not of course but somewhat of grace, must come with clean hands, will be applied whether pleaded in the answer or not. And where the plaintiff was a mere "straw man" for an undisclosed principal, and his name was attached to the duplicate of the contract furnished the seller's purchaser by an officer of such principal, and all the parties on plaintiff's side worked under cover and kept the true facts concealed from the seller and her agent, the court will apply the rule, and deny specific performance.

Appeal from St. Louis City Circuit Court.—*Hon. Robt. M. Foster,* Judge.

REVERSED AND REMANDED (*with directions*).

*R. M. Nichols* for appellant.

(1) The contract shown in evidence being unilateral and containing a provision that it should be closed twenty days from February 3d, or earnest money forfeited, time of performance became the essence of the contract. Unless the purchase money was tendered and demand of a deed made on or before Saturday, February 23, 1906, the right of the plaintiff to require the defendant to perform the contract became *ipso facto* gone. The contract was a mere option, because the vendee was not bound. Cockrell v. Bopp, 106 Mo. App. 555; Hollmann v. Conlon, 143 Mo. 369; Huer v. Rutkowsky, 18 Mo. 218; Fry on Specific Perf. (3 Am. Ed.), sec. 1073; Pomeroy on Contracts (2 Ed.), sec. 362; Pollock v. Brookover, 6 L. R. A. (N. S.) 403, note. (2) There was nothing in the evidence which would excuse the alleged vendee from showing his good faith in an effort to perform the contract by a tender of the money on February 23, 1906, or on February 25, 1906, and following up the tender by bringing the money into court and depositing it with the clerk. This was a performance of a contract which he did not seek. Deichman v. Deichman, 49 Mo. 107; Lanyon v. Chesney, 186 Mo. 540; Cockrell v. Bopp, 106 Mo. App. 555; Lumaghi v. Abt, 126 Mo. App. 221; Short v. Kieffer, 142 Ill. 266; Chaney v. Libby, 134 U. S. 68; Pomeroy on Contracts, sec. 362. (3) Houtz admittedly has no interest in this suit or the contract forming its basis. The Burdeau Real Estate Company, which is not a party, is alone in interest. Under the statute the suit must be brought in the name of the real party in interest. Under the contract, Houtz not being designated as agent, nor the Burdeau Real Estate Company as principal, no suit could be maintained in the name of the Burdeau Real Estate Company on the contract, and no

Houtz v. Hellman.

suit should be maintained in the name of Houtz because he admittedly has no interest in the property. R. S. 1899, sec. 540; Kelly v. Thuey, 102 Mo. 522; Martin v. Platt, 5 N. Y. S. 284; Morris v. Lewis, 33 Ala. 53. (4) Houtz confessedly has no interest. Under the statute he cannot maintain the suit. The suit is not in his name for the benefit of the Burdeau Real Estate Co., and the latter could not maintain an action on the contract, because the contract is under seal. Clarke v. Courtney, 5 Pet. 319; Iron Co. v. Iron Co., 38 Fed. 66; Coal Tar Co. v. Fletcher, 61 Md. 288; Schaefer v. Henkel, 75 N. Y. 378; Brown v. Morris, 83 N. C. 254; Barham v. Bell, 112 N. C. 131; Kempner v. Dillard, 100 Tex. 505; Henrichs v. Engelhart, 137 N. Y. 494. (5) It was admitted that Burdeau wrote Houtz's name upon the counterpart of the contract shown in evidence, and placed it in the hands of the defendant. This was done for the purpose of deceiving defendant's agent into the belief that Houtz was the real purchaser. While it is perfectly legal to take a contract of sale in the name of an agent, it cannot be done by means of such false pretense, and although there was no damage shown by reason of such false pretense, a court of equity will not lend its aid to a company which through its president, has been guilty of such false pretense. 26 Ency. Law (2 Ed.), p. 47; Railroad v. Curtis, 154 Mo. 10; Kelly v. Railroad, 74 Cal. 557; Reynell v. Sprye, 1 DeG. M. & G. 660; 2 Pomeroy's Eq. Jur., secs. 873, 902, 903; Pomeroy on Contracts (Spec. Per.), sec. 268.

*H. A. & C. R. Hamilton* for respondent.

(1) A person with whom or in whose name a contract is made for the benefit of another, is a trustee of an express trust, and may bring an action for the enforcement of the contract, without joining the principal. R. S. 1899, sec. 541; Snyder v. Express Co., 77

Mo. 523; Wolfe v. Railroad, 97 Mo. 473; Kelly v. Thuey, 102 Mo. 522; Springfield v. Weaver, 137 Mo. 650; Sawyer v. Railroad, 156 Mo. 468; Simmons v. Wittmann, 113 Mo. App. 357. (2) Appellant was unable to convey a perfect title on the date specified in the contract, and no tender of performance by respondent was necessary. A purchaser, ready and willing to perform, is not required to tender the purchase money, when the vendor is unable to convey the land. 28 Am. and Eng. Ency. Law, p. 9; 29 Ib. 692; R. S. 1899, sec. 930; Reynolds v. Reynolds, 45 Mo. App. 622; Warren v. Crew, 22 Ia. 315; Gormley v. Kyle, 137 Mass. 189. (3) When the vendor claims to have rescinded, repudiates and denies the obligation of the contract, placing himself in such a position that it is evident if a tender was made its acceptance would be refused, then no tender need be made by the vendor. In such a case it is enough if the plaintiff offer by his bill to bring in the money when the amount is liquidated and he has his decree for performance. Deichman v. Deichman, 49 Mo. 107; Lanyon v. Chesney, 186 Mo. 540. (4) By filing an amended answer, appellant waived any error committed by the court in sustaining the demurrer to her former answer. Heman v. Glann, 129 Mo. 325. (5) The action of the court in sustaining the demurrer to the original answer is not subject to review, because the action of the court is not set up in the motion for new trial as one of the reasons therefor. Acock v. Acock, 57 Mo. 154; Williams v. Railroad, 112 Mo. 463.

LAMM, P. J.—Specific performance of a contract for the sale of real estate. Defendant comes up from a decree for plaintiff.

On February 3, 1906, defendant, a widow, owned a lot fronting on the south side of Pine street, St. Louis, 21 feet 6 3-4 inches by a depth of 109 feet, with a building thereon known as "1420 Pine." At that

time she was in Eureka Springs, Arkansas. Her son, Charles, held a warrant of attorney executed by her in 1892 at Mannheim, Germany, making him the donee of a power to sell and deed said lot—its acknowledgment reading: "Before me, Jno. F. Winter, U. S. Consul at Mannheim, personally appeared the within named Bertha Hellman, who acknowledged that she signed, sealed and delivered the above power of attorney, on the day and year of its date, for the purposes, therein expressed. In testimony whereof," etc.

It will be seen that this acknowledgment does not state that Mrs. Hellman was "personally known" to the officer "to be the person whose name is subscribed to the instrument as a party thereto," as provided in section 913, Revised Statutes 1899; nor does it certify that she executed the instrument as her "free act and deed," as per the *form* of acknowledgment suggested by that section.

Under that power of attorney, Charles signed in duplicate a contract, *viz.*:

"CONTRACT OF SALE.

"ST. LOUIS, Mo., Feby. 3, 1906.

"Received of Chas. Houtz two hundred and fifty dollars, as earnest money and part purchase money on account of the purchase of the following described property, situated in the city of St. Louis, State of Missouri, to-wit: Lot, together with improvements thereon, known as No. 1420 Pine st., situated on the south side of Pine st., 79 feet east of the east line of 15th st., said lot having a frontage of 21 feet six and 3-4 inches by a depth of 109 feet to alley, all in C. B. 499, which property is this day sold to Chas. Houtz for the total sum of seventy-five hundred dollars, payable as follows: All cash less amount of above earnest money herewith paid. Rents to be adjusted from date sale is closed. The title to said property to be perfect

and to be conveyed by warranty deed free from liens and encumbrances, except taxes for the year 1906 and thereafter, which the undersigned purchaser agrees to pay.

"If the title be found imperfect and cannot be perfected within a reasonable time, said Chas. Houtz is to be paid the cost of examining title, and earnest money to be refunded.

"The sale under this contract to be closed within twenty days from date or earnest money forfeited.

"Accepted on above terms and conditions.

"MRS. BERTHA HELLMAN, (Seal)
"CHAS. HELLMAN, (Seal)
Attorney."

The decree specifically performed the foregoing contract.

No question is made on the petition. Defendant's first answer covered four defenses: First, a general denial; second (in substance) fraud, viz., that Houtz has no interest in the subject-matter of the suit, was a "mere straw man or kite," held a "servile position" in a restaurant and was wholly without "means or substance;" that one Burdeau or some person unknown to defendant is the only person interested in the purchase, and, if the contract is binding, it is for the use and benefit of Burdeau or such other person; that defendant was deceived by the false representations of Burdeau or such other person into believing that Houtz was a bona fide purchaser and was able and willing to purchase, etc., and that, to induce defendant to sign the contract and become bound, Burdeau or such other person, secretly and without the knowledge or authority of Houtz, signed his name to a duplicate of the contract and delivered the same to defendant, representing the signature as genuine, all of which statements were false and fraudulent, were relied upon as true and defendant thereby was induced

to sign, etc.; third, that the contract in suit was void because "the same is the product or outgrowth of an effort of the person or persons offering for sale the said real property described in plaintiff's petition, without first having obtained the written authority of the owner of said property, or the written authority of her attorney in fact appointed in writing, or of first having obtained the written authority of the person who has made a written contract for the purchase of said property with the owner thereof, all of which plaintiff well knew, or had constructive or actual knowledge thereof." (Note: The obscure language of the third defense evidently relates to the acts of one Hamburg and one Moser who flitted in and out during the negotiations, higgling and dickering, and who were evidently in the pay of and used as conveniences by the Burdeau Real Estate Co., as will presently appear); and, fourth, that, if plaintiff was acting for an undisclosed principal at the time, then the contract was void, for that plaintiff was not authorized in writing to make it.

Plaintiff demurred to the last three defenses on the ground that, severally, they did not state facts sufficient to constitute a defense to plaintiff's cause of action. That demurrer was sustained—defendant excepting and filing a term bill of exceptions. At a subsequent term she filed an amended answer raising the general issue, and, second, alleging there was a "misjoinder of parties plaintiff," that one Burdeau is the real person interested in the subject-matter of the suit and that plaintiff is in no way interested therein and should not be allowed to maintain the same. To this last defense, plaintiff replied with a denial.

Such were the paper issues. Other facts essential to a determination of the appeal will appear later.

I. The fourth point in respondent's brief reads: "By filing an amended answer, appellant waived any

error committed by the court in sustaining the demurrer to her former answer.'' The fifth reads: ''The action of the court in sustaining the demurrer to the original answer is not subject to review, because the action of the court is not set up in the motion for a new trial as one of the reasons therefor.''

With this *parry* in respondent's brief we naturally turn to see the *thrust* in appellant's, and find the situation novel; for appellant does not assign error in the ruling on the demurrer. The matter is elaborated in her abstract, but when it comes to the brief and assignment of error, her counsel apparently doubted his right to have the ruling on the demurrer reviewed in this court, so he says nothing about it. Despite his silence, tantamount to abandonment, counsel for respondent (anxious, maybe) deem it worth while to defend the trial court. As seen, they make the point that the error was waived first by filing the amended answer and again by failing to make the ruling a ground in the motion for a new trial. (*Nota bene*: That motion had no such ground.)

Attending to this phase of the case, the general rule is that in argumentation he who affirms carries the burden. Our rules are constructed on the theory that appellant's brief must allege the error relied on for reversal and that no reference will be permitted to errors not thus specified, unless for good cause shown. [Rule 15.]

Since respondent brings the question in, we will notice it so that it will not be taken as of course that we agree with respondent's view of it. A demurrer, differing from a motion, is a part of the record proper. It needs no term or final bill of exceptions to preserve it. [Spears v. Bond, 79 Mo. l. c. 469; Tarkio v. Clark, 186 Mo. l. c. 293-4; Mallinckrodt Chem. Works v. Nemnich, 169 Mo. l. c. 395 and cases cited.]

By the same token (a motion for a new trial being directed to matters of exception), the ruling on the

demurrer finds no place in a motion for a new trial. [Dysart v. Crow, 170 Mo. 280; McKenzie v. Donnell, 151 Mo. l. c. 448; Thorp v. Miller, 137 Mo. l. c. 238-9.] This, because such ruling is also part of the record proper and no exception is necessary.

It is accepted doctrine also that if defendant unsuccessfully demur to plaintiff's petition and thereafter answers over to the merits, by such answer he waives all grounds of demurrer except two cardinal ones, *viz.*, jurisdiction of the subject-matter and that the petition does not state facts sufficient to constitute a cause of action. [Jones v. Railroad, 178 Mo. l. c. 538-9; Hanson v. Neal, 215 Mo. l. c. 277.] By parity of reasoning, if plaintiff's demurrer to the three last defenses in the answer, on the ground that they did not state facts sufficient to constitute a defense, had been overruled and plaintiff had then replied, he should not be held to have waived his point. The question whether the answer did state matter sufficient to constitute a defense should still be open for review precisely as the question whether a petition states a cause of action is open for review after demurrer overruled and defendant answers over.

True, we are indulging an hypothesis that the demurrer was overruled, whereas, in point of fact, it was sustained. Now, on a demurrer to a petition, if sustained, several choices are open to a plaintiff. For instance, he may go out of court; or he may stand on his petition, suffer judgment and appeal; or he may plead over and go on. If he choose the last string to his bow and pleads over, he necessarily waives all questions on the demurrer by abandoning the original petition. All issues are then framed on the answer and last petition, and the trial and judgment proceed on such pleadings. But a defendant, whose defenses are held bad on demurrer, has only Hobson's choice. He takes what is left. He cannot go out of court and thereby avoid a judgment on the merits against him.

He was brought in *willy nilly* at the start and is held in *willy nilly* to the end. In such predicament, he is entitled to every defense he may have whether legal or equitable. So the code runs. If he is forced to abandon some of his defenses by erroneous adverse rulings of the court on his adversary's demurrer, he may stand on his mutilated answer and all would agree that, in such event, he waives no right to have the point reviewed. Why, then, does he waive the right to have the point reviewed if he make the best of it, submit because he can not help himself, and, putting his best foot foremost, interpose another defense by interlineation in his old answer or by filing another? It seems clear that, to work out justice, a defendant and plaintiff do not always stand on the same foot in matter of waiver under our code procedure, and that the same rule ought not to be applied mechanically and to each, regardless of the underlying reason of the rule itself.

In Cochran v. The People's R. R. Co., 113 Mo. l. c. 336, we said: "It must be remembered that a defendant occupies a different attitude from his adversary, the plaintiff. The plaintiff brings the action. If the ruling is adverse, he may take a nonsuit. Not so with the defendant. He is in court without his consent. The court may make any number of rulings that he may deem erroneous, but he cannot abandon the case; he is in court and must remain till the cause is finished. He has a right to tender as many defenses as he has. If the court erroneously deny him one, he must avail himself as best he can of those remaining. He, however, advises the court and his adversary of his claim, and if he submits, as he is bound to do, to the ruling of the court, and tries his case in accordance with the judgment of the trial court, on what principle is he estopped from complaining of the action of the trial court and his adversary in forcing him to fight the battle upon ground selected by them and at a great

disadvantage to him? We see no element of estoppel in such a case.''

The reasoning of that case was approved and followed in Kenefick-Hammond Co. v. Fire Ins. Soc., 205 Mo. l. c. 307 *et seq.*, and seems to apply to the question in hand.

We were led to say what we have because of the importance of the question, but it should be left for determination to a case properly raising and briefing it and should not be settled in this case where appellant, entitled to raise it, declines to do so and where respondent defends the trial court though appellant does not charge it with error in that behalf. Accordingly, we reserve the question.

II. A proper disposition of the next question seeks more of the facts. A domestic corporation, the Burdeau Real Estate Company, a habitant of St. Louis, was the real purchaser of the property. We will hereinafter call it the ''company.'' Its plan was to keep itself in the shadow, until the exigencies of the case forced it into the sunlight. There is a resort in that great city known as the ''Golden Lion.'' It seems beer is sold there. Houtz, the plaintiff, serves at the ''Golden Lion,'' presumably assembling such proportions of beer and foam in each customer's glass. as leaves the ''Golden Lion'' an increment of profit on the sale. At a certain time the corporate eye of the company was fixed on Houtz as a present holding receptacle for its land titles and a future conduit through which such titles might pass to subsequent purchasers, without liability to the company as warrantor. Whether Houtz acted as such receptacle and conduit from love of gain or received a recompense in mere sentimental ways is dark, but he assumed the role of such mysterious convenience whereby the company killed two birds with one stone, *viz.,* pocketed the gains of the traffic in land titles while avoiding liability for

loss. There is no evidence that defendant or her agent, Charles Hellman, knew Houtz was used by the company as such convenience. At a certain time one Charles J. Moser heard from a Mr. Sayers that defendant's property was on the market. Moser is also in the real estate line, having some casual but undisclosed connection with the company, at least in this transaction. Armed with such information, Moser went to a place called Real Estate Row on Chestnut street. He there met a man named Hamburg, who seems also to have such undisclosed connection (whatever it was) with the company, as induced him to refer to it as "his client." At any rate, these two laid their heads together and agreed that an attempt should be made to buy the lot for Hamburg's "client." Hamburg did not disclose his "client's name" to Moser and the mystery was cleared up only by the appearance of the company on the stage at the final scene. Moser presently met Charles Hellman. A price was agreed upon, and the contract of sale was prepared in duplicate in the name of Houtz; a check evidencing the earnest money ($250) was given by the company payable to Houtz and indorsed to Hellman— Hamburg paying Moser $50 for his services and getting $50 from his then undisclosed principal for his. Charles Hellman refused to close the transaction with Moser without Houtz's signature to the contract. Thereupon Moser took it away to procure such signature. He returned ostensibly with Houtz's signature thereto, and turned Hellman over a duplicate of the contract so signed, thereby completing the contract. At the trial neither Houtz nor Hamburg testified, and when it was discovered, as it was, that the signature of Houtz on defendant's duplicate was not the same as his endorsement on the check for the earnest money, the investigation in that regard was stopped at that point by an admission in open court to the effect that *Houtz did not sign defendant's duplicate,* that (to

quote) "the contract signature is not the identical signature of Mr. Houtz," but was written on the paper by Mr. Burdeau, the representative of the company. Mr. Burdeau testified that: "Houtz was a straw man for me. He represents me in this matter." Plaintiff's testimony also shows that the plan of the company was to borrow from one Love the entire purchase price in the name of Houtz and secure the loan on the lot in question. We gather that the money so borrowed was to be used in the purchase of the lot, that Houtz was to make the loan simultaneously with getting his deed from defendant—one hand washing the other. There is evidence, however, that the company had money in the bank sufficient to make a *tender* of the purchase price in the first instance, and, if a tender was necessary, intended to use its own money in making one. To show that Houtz was able and willing to perform at the time of the trial, a certified check from the company of that date payable to his order, for the amount of the purchase price, was introduced in evidence.

This is sufficient of the record to pass upon the following question, *viz.*: Should a chancellor, armed with a discretion, specifically enforce the contract under the circumstances just disclosed? In other words, does plaintiff come into a court of equity with clean hands? On that question we rule:

(a). That for the purpose of disposing of the precise question now up, the matter of Houtz's ability to perform, through a loan or through a temporary advancement of the purchase price by the company for the purposes of a tender, or payment, is not decisive. Therefore, by way of elimination, we put it to one side for the present.

(b). The contract was not in the form of an option but in a form involving mutuality—that is, an obligation to sell on one side and impliedly to purchase on the other. Under the Statute of Frauds,

Houtz's signature was necessary to the contract in order to bind him and support a suit by defendant for specific performance on Houtz's failure to perform. Defendant, through her agent, as was her clear right, demanded such signature as a condition precedent to consummating the contract.    That demand was answered with a false and sham signature, and defendant, relying on its genuineness, closed the deal by delivery of the contract.

In this condition of the record the case does not call for judicial comment on the business morality of the secret and deceptive use of a "man of straw" in real estate contracts—a questionable practice, the product of insincerity and mere sharp commercialism. By the term "man of straw" we understand one of no substance, one in name only, an irresponsible person having no property to respond in damages, who loans himself out to others to sign contracts as a purchaser knowing he is acting a lie—an office no honorable man should fill, and no honorable man should ask another to fill.    When a case comes here in which a litigant, innocent of the deception practiced on him, is fraudulently misled and injured by the man-of-straw method, and raises such issue by his pleading, we can deal with it.

But under the power and discretion lodged in a chancellor in cases of specific performance we think the case does call for comment on the business morality of using not only a man of straw as a contracting party but the shade of a shade, *viz.*, the straw name of a "man of straw," to induce the owner of real estate to become bound in a contract of sale.    Look at it.    If the widow Hellman had sued Houtz on the contract and he had pleaded *non est factum,* and the fact had appeared that he had not signed it, it is no answer to say that she could have shown that the company was authorized to sign his name and bind him.    This, for more reasons than one.    In the first place it is not

shown that the company had any such authority. In the next place, holding the hidden key to the concealed fact, the company was itself in ambush and its connection with the transaction was in the shade. So Hamburg was in the shade and concealed even from Moser his client's name. What right have people, moving with such studied and serpentine sinuosity, to throw the burden upon a real estate owner of ferreting out the facts essential to making a binding mutuality in a contract of sale, when such owner was entitled to straightforward dealing and a genuine signature to his contract, free from any such burden or danger? None this court knows of.

Nor is it any answer to say, as was said at our bar, that by suing on the contract Houtz ratified it and became bound. The widow Hellman was entitled to have him bound at the start. She gave no option to have him bound or not bound as he might elect at some future time. If the price of real estate had gone down instead of up, as it did, and she had sued him for specific performance, she had the right to rest on a certainty that the party to be charged had signed the contract, not upon a mere possibility of being able to prove that the fictitious signature was authorized, or the contract ratified.

On this view of the case, the contract sued on was a trick, an intended deception and snare. The story of its birth, told in the language of this record, brings a blush and makes justice avert her face for very shame. Whether, then, we look at the nominal plaintiff or (through such parody on a man) to the corporate company, claiming to be the beneficiary in the contract and who is here seeking to gather in its fruits under cover of its straw man's name, neither of them came into a court of equity with clean hands. Therefore, a chancellor should not lift a finger by way of performance, and we shall not.

And this is so although defendant's plea of fraud

was stricken out on demurrer and she did not plead in her amended answer that plaintiff was not entitled to equity because he came into a court of conscience with unclean hands. Fortunately, no such allegation was necessary to invoke the maxim. The maxim is enforced by the chancellor, *ex mero motu,* and because of public policy, when the facts call it into use. Sometimes, though the disclosures are made at the trial as happened in this case, it is applied where both plaintiff and defendant have knowingly made a contract tainted with illegality; sometimes it is applied where only the party seeking to enforce is in fault; but it proceeds always on the theory that the dignity of the court is touched to the quick, and that courts of equity will not countenance iniquity. So runs the equity maxim. He who has commited iniquity shall not have equity.

In this connection it will do to say that the ruling just made is reinforced by other equitable principles. For example, it is trite doctrine that specific performance does not go in all cases where a suit for damages for violating the contract might lie. So, specific performance is a matter somewhat of grace, not a hard-and-fast matter of right and as of course. It rests in the sound discretion of the chancellor. So, it "requires a much less strength of case on the part of the defendant to resist a bill to perform a contract, than it does on the part of the plaintiff to maintain a bill to enforce a specific performance." [2 Story's Eq. (13 Ed.), sec. 769.] The remedy is not allowed in cases of fraud, or of mistake, or of hard, biting and unconscionable bargains or where a decree under all the circumstances would be inequitable. Nothing herein to be construed as affecting plaintiff's right to a return of $250 of earnest money.

III. Defendant, through her agent, at the contract time of compliance offered a deed by Charles

Hellman under the power donated him in the old Mannheim power of attorney. Plaintiff refused to accept such deed, insisting that the power of attorney was not properly acknowledged and, therefore, was not entitled to record. He demanded a deed directly from Mrs. Hellman or one executed under a new and properly acknowledged power of attorney. Such issue is discussed in briefs. Again, on the part of defendant, it is claimed that no tender of the purchase price was made in compliance with the contract time, and that time was of the essence of the contract. *Contra,* it is argued that defendant was not ready to perform, *ergo,* plaintiff was not obliged to make a tender. There is testimony tending to show that a tender was waived, and other testimony tending to show it was not waived. Again, it is asserted by defendant's counsel (and denied by plaintiff's) that the suit was improperly brought in the name of Houtz. Defendant argues it should have been brought in the name of the Burdeau Real Estate Company. Plaintiff argues that Houtz was the trustee of an express trust, that the contract was made in his name for the benefit of the company, and a suit could therefore be prosecuted in the contracting party's name.

But as the case has been allowed to break in paragraph two on the maxim that he who comes into equity must come with clean hands, we deem it unnecessary to prolong the opinion by stating the facts on which the questions just outlined depend, or to determine the questions themselves. We mention them to show they were not overlooked.

The premises considered, the decree was for the wrong party. Let the judgment be reversed and the cause remanded with directions to enter a decree in favor of defendant, dismissing plaintiff's bill. It is so ordered  All concur.