CARROLL A. NIXON AND OPAL I. NIXON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nixon v. Commissioner
Docket No. 4979-84.
United States Tax Court
T.C. Memo 1987-318; 1987 Tax Ct. Memo LEXIS 318; 53 T.C.M. (CCH) 1251; T.C.M. (RIA) 87318; June 25, 1987. Gerald J. Zafft, for the petitioners. James A. Kutten, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION "KORNER, Judge: Respondent determined a deficiency in petitioners' Federal income tax of $30,250 for the tax year ended December 31, 1981. After concessions, the sole issue for decision is whether petitioners' *319 disposition of their 309-acre farm located in Clark County, Missouri, in March 1981, qualifies, at least in part, for nonrecognition of gain under section 1031. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Carroll A. Nixon (hereinafter "petitioner") and Opal I. Nixon, husband and wife, resided in Kahoka, Missouri, at the time they filed their petition herein. Petitioners filed a joint Federal individual income tax return for the taxable year ended December 31, 1981. Petitioner was a livestock and grain farmer in 1980 and 1981. Approximately 440 acres of farmland in Clark County, Missouri, were owned by petitioners as tenants by the entirety during this period, including the 309 acres at issue (hereinafter the "309-acre tract"). Sometime during 1980, the Conservation Commission of the State of Missouri (hereinafter the *320 "Commission") began investigating the possibility of acquiring the 309-acre tract from petitioners, as well as 81 acres and 320 acres from two adjacent landowners. The Commission first contacted petitioners in May or June of 1980. On July 1, 1980, the Commission submitted a document entitled "Offer to Sell Real Estate and Contract of Sale," to petitioners, whereby the Commission sought to purchase the 309-acre tract. The purchase price specified in the contract was $1,100 per acre, or a total purchase price of $339,900. The July 1, 1980 offer was not accepted by petitioners. Petitioner informed Terry Dalley, a representative of the Commission, that he did not want to sell the real estate, but instead desired to trade it for other real estate. In September 1980, petitioner spoke with Forrest Phillips regarding a trade of the 309-acre tract. As a result of the conversation, petitioner had an instrument entitled "Real Estate Contract" prepared setting forth the proposed exchange. This instrument was never executed. Later in the fall of 1980, petitioner conversed with Orville Worrell, in an attempt to exchange the 309-acre tract for real property owned by Mr. Worrell and his wife. *321 A document entitled "Contract for Exchange of Property," dated October 10, 1980, was drafted to reflect the proposed transaction. However, this contract was never executed and the exchange was not consummated. In October 1980, the Commission approached petitioners a second time in an attempt to purchase the 309-acre tract. On October 21, 1980, the Commission submitted a second contract, entitled "Offer to Sell Real Estate and Contract of Sale" (hereinafter the "Contract"), to petitioners for the purchase of the 309-acre tract at $1,100 per acre for a total purchase price of $339,900. The Contract was executed by petitioners, [2] and on October 27, 1980, was executed by representatives of the Commission. The Contract provided that petitioners reserved the right to use the land for pasture until October 1, 1981, and that "the total contract price shall be paid after January 1, 1981 but before January 15, 1981." On October 29, 1980, the Missouri Department of Conservation sent petitioners a blank voucher requesting them to fill out the information on the voucher and return it to the Commission. The voucher requested the Treasurer of the State of Missouri to pay $339,900 to petitioners *322 for the 309-acre tract. Petitioners filled out the voucher and requested that a check for $339,900 be made payable to them. The total purchase price was not paid by the Commission to petitioners before January 15, 1981. After January 15, 1981, petitioners continued to try to effectuate an exchange of the 309-acre tract, and so advised the Commission. On March 1, 1981, petitioners contacted Gene Phillips (hereinafter "Gene"), Forrest Phillips' son, to negotiate an exchange of property owned by Forrest Phillips (hereinafter "Mr. Phillips") and his wife, while Mr. Phillips was on vacation in Florida. At that time, Gene was in the farming business with his father. Petitioner negotiated with Gene for an exchange of a portion of petitioners' 309-acre tract for 220 acres of farmland owned by Mr. Phillips in Clark County, Missouri (hereinafter the "220-acre tract"). The remainder of petitioners' land that was not exchanged with Mr. Phillips was then to be sold to the Commission. Sometime before March 6, 1981, petitioner and Mr. Phillips, through Gene, orally agreed [3] to exchange a 35 percent *323 interest in the 309-acre tract, or approximately 109 acres, for the 220-acre tract, based upon the relative values of the lands. [4]
On March 5, 1981, the Treasurer of the State of Missouri issued Check Number 3581405, in the amount of $339,900 payable to "Carroll Nixon and Opal Nixon" as payment for petitioners' 309-acre tract the ("$339,900 check"). On March 6, 1981, petitioners executed a general warranty deed conveying the 309-acre tract to the Commission. The warranty deed states that petitioners covenant that: they are lawfully seized of an indefeasible estate in fee in the premises herein conveyed; that they have good right to convey the same; that the said premises are free and clear of any encumbrances done or suffered by them or those under whom they claim and that they will warrant and defend the title to said premises unto the said party *324 of the Second Part [the Commission] * * *. Also on March 6, 1981, upon execution of the general warranty deed, petitioners received the $339,900 check from the Commission and the deed was recorded in the Office of the Recorder of Deeds, Clark County, Missouri. Petitioners did not deposit the $339,900 check, but instead, put it in their "deep freeze" [5] until Mr. Phillips returned from Florida. Mr. Phillips returned on March 16, 1981, and met with petitioners on March 17, 1981. On that date the following transactions occurred: (1) Mr. Phillips and his wife executed a general warranty deed conveying the 220-acre tract to Opal Nixon; (2) petitioners and Mr. Phillips endorsed the $339,900 check, which was then deposited into Mr. Phillips' account; and (3) Mr. Phillips issued a check to petitioners in the amount of $218,900 which was then deposited by them in their bank account. Petitioners had used the 309-acre tract in the farming business and have continued to use in their farming business the 220-acre tract *325 received from the Phillipses. Petitioners' adjusted basis in the 309-acre tract prior to the sale was $30,900. In their income tax return for the 1981 tax year, petitioners reported long-term capital gain on the disposition of the 309-acre tract as follows: Amount Realized
$218,900
Adjusted Basis
30,900
Reportable Gain
$188,000
(before sec. 1202 deduction)
The $218,900 figure represents petitioners' allocation of the proceeds relating to 200 of the 309 acres transferred to the Commission. [6] The proceeds relating to the transfer of the remaining 109 acres, $121,000, did not appear on the return in any fashion. On November 30, 1983, respondent issued a statutory notice of deficiency to petitioners for the taxable year ended December 31, 1981. In the notice of deficiency, respondent determined that section 1031 could not be applied to any portion of the disposition of the 309-acre tract, and that petitioners realized a long-term capital gain from the transaction, calculated as *326 follows: Amount realized
$339,900
Adjusted basis
30,900
Reportable Gain
$309,000
(before sec. 1202 deduction)
OPINION The issue for decision is whether the gain realized on petitioners' disposition of the 109-acre portion of the 309-acre tract qualifies for nonrecognition under section 1031. Section 1031(a), as in effect during the year in issue, provided that: No gain or loss shall be recognized if property held for productive use in trade or business or for investment * * * is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment. See also sec. 1.1031(a)-1, Income Tax Regs.The requirements of section 1031 are thus threefold: (1) There must be an exchange; (2) the properties exchanged must be of a like kind; and (3) the property transferred and the property received must be held by the taxpayer either for use in a trade or business, or for investment. The parties do *327 not dispute that the last two requirements have been complied with; rather, the dispute centers on the first requirement, viz, whether there was an exchange. [7]
"The touchstone of section 1031 * * * is the requirement that there be an exchange of like-kind business or investment properties, as distinguished from a cash sale of property by the taxpayer and a reinvestment of the proceeds in other property." Barker v. Commissioner,74 T.C. 555, 560-561 (1980) (emphasis in original); Swaim v. United States,651 F.2d 1066, 1069-1070 (5th Cir. 1981); Starker v. United States,602 F.2d 1341, 1352 (9th Cir. 1979); Smith v. Commissioner,537 F.2d 972, 975-976 (8th Cir. 1976), affg. a Memorandum Opinion of this Court; Carlton v. United States,385 F.2d 238, 241 (5th Cir. 1967); Rogers v. Commissioner,44 T.C. 126, 133 (1965), affd. per curiam 377 F.2d 534 (9th Cir. 1967). *328 As we also stated in Barker v. Commissioner,supra at 561: The "exchange" requirement poses an analytical problem because it runs headlong into the familiar tax law maxim that the substance of a transaction controls over form. In a sense, the substance of a transaction in which the taxpayer sells property and immediately reinvests the proceeds in like-kind property is not much different from the substance of a transaction in which two parcels are exchanged without cash. Bell Lines, Inc. v. United States,480 F.2d 710, 711 (4th Cir. 1973). Yet, if the exchange requirement is to have any significance at all, the perhaps formalistic difference between the two types of transactions must, at least on occasion, engender different results. Accord, Starker v. United States,602 F.2d 1341, 1352 (9th Cir. 1979). Other courts have similarly acknowledged that transactions that take the form of a cash sale and reinvestment cannot, in substance, constitute an exchange for purposes of section 1031. Bell Lines Inc. v. United States,supra; *329 Carlton v. United States,supra;Coastal Terminals, Inc. v. United States,320 F.2d 333 (4th Cir. 1963). Hence, our inquiry is more narrowly focused on whether the disposition of a 109-acre portion of the 309-acre tract was a sale, as argued by respondent, or an exchange, as argued by petitioners. In Carlton v. United States,supra, the parties to an exchange agreement deviated from their original plan and at the closing the taxpayers received unrestricted cash and contracts to purchase the properties they sought. Later that day and the next day, the taxpayers used the cash to complete the acquisition of those properties. The taxpayers argued that their original intent to exchange coupled with their use of the cash proceeds to acquire like-kind properties brought their transaction within section 1031. The court stated: The very essence of an exchange is the transfer of property between owners, while the mark of a sale is the receipt of cash for the property. [Citations omitted.] Where, as here, there is an immediate repurchase of other property with the proceeds of the sale, that distinction between a sale and *330 exchange is crucial. * * * [385 F.2d at 242.] The court in Carlton found that no exchange had occurred, but that instead, there had been a cash sale and a reinvestment of the unrestricted proceeds. On this point the court wrote: The fact that they did use [the sales proceeds] to pay for the Lyons and Fernandez properties does not alter the fact that their use of the money was unfettered and unrestrained.It is an inescapable fact that the money received by appellants from General was money paid to them for a conveyance of their land. As a result, the separate transaction between General and the appellants must be construed to be a sale, and the transactions between the appellants and Lyons and Fernandez as a purchase of other property. * * * [385 F.2d at 243; emphasis added.] Accord Swaim v. United States,supra.[8]
*331 We believe the instant case is governed by Carlton. Here, petitioners initially intended to consummate an exchange of the 109-acre portion of their 309-acre tract for the 220-acre tract owned by the Phillipses. Then the Phillipses, as owners of the 109-acre parcel, and petitioners, as owners of the remaining 200 acre parcel were to sell the entire 309 acres to the Commission. Petitioners, however, did not complete the exchange as planned. They instead transferred the 309-acre tract to the Commission and received in return, pursuant to a voucher requested and signed by them, a $339,900 check made payable only in their names. That the proceeds were later reinvested in like-kind property is irrelevant. What is relevant is that, here, as in Carlton, the unfettered and unrestricted control over the cash proceeds from the sale vested solely in petitioners. [9]
*332 Petitioners attempt to distinguish cases like Carlton by arguing that they did not have dominion and control over the sales proceeds. They argue that the terms of the oral agreement between themselves and Mr. Phillips required them to distribute a portion of the proceeds to Mr. Phillips, as a condition for his agreement to exchange the properties, and thus, the reguisite exchange was present. We disagree, primarily for two reasons. First, the form used by petitioners in structuring the transaction does not support their contention that an exchange took place. As we indicated above, the entire proceeds from the sale of the 309-acre tract were delivered without restriction directly to petitioners. They then, in turn, used the funds to purchase the Phillips's 220-acre tract. Had the transaction been structured as an exchange, it would appear that two separate checks would have been issued by the Commission -- one to the Phillipses for their 109-acre parcel and one to petitioners for the remaining 200 acres. We also find it relevant that title to the 309-acre tract passed directly to the Commission from petitioners, who claimed in the instrument of conveyance that they held *333 the property by an indefeasible fee estate. Mr. Phillips testified that: (1) A deed was never prepared conveying any interest in the 309-acre tract to himself; (2) he did not execute a deed conveying any interest in the 309-acre tract to the Commission or any other party; (3) he never farmed the 309-acre tract; and (4) he never had a possessory interest in the 309-acre tract. Had the transaction been structured as an exchange, it is apparent that title to the 109-acre parcel would have passed first to the Phillipses and then to the Commission. Second, petitioners have not proven [10] that the oral agreement to exchange land between petitioners and the Phillipses, which might have required petitioners to tender a portion of the sales proceeds to the Phillipses, was enforceable under the statute of frauds, as codified in Missouri. [11] Petitioners claim that deeding the 309-acre tract to the Commission on March 6, 1981, constituted partial performance of the oral agreement, and thus, that act rendered invalid any statute of frauds defense petitioners might have had against a suit brought by the Phillipses to enforce the agreement. As such, petitioners argue that they did not have unrestricted *334 control over the entire proceeds on the 309-acre tract as they were required by the oral agreement to distribute a portion of the proceeds to the Phillipses for their interest in the 109-acre parcel. In our view, petitioners' argument is misplaced. In order to constitute a bar to the statute of frauds defense, such partial performance must, standing alone, exclusively refer to the oral contract *335 in question. Alonzo v. Laubert,418 S.W.2d 94, 97 (Mo. 1967). [12] As respondent correctly points out, petitioners deeded the 309-acre tract to the Commission and in return received a $339,900 check made payable only in their names. These acts refer solely to the contract of sale of the 309 tract between petitioners and the Commission and in no sense are probative of the existence of an oral contract of exchange between petitioners and the Phillipses. Furthermore, only "'Where one party relying on an oral contract has so far performed his part of it that it would be perpetrating a fraud on him to allow the other to repudiate the contract and to set up the statute of frauds in justification thereof * * *' will equity 'regard the case as being removed from the operation of the statute [citation omitted].'" Alonzo v. Laubert,supra at 97. On our facts, as the Phillipses had not performed any acts required by the oral agreement between the time petitioners received the check from the Commission (March 6, 1981) and the time the Phillipses deeded *336 the 220-acre tract to petitioners (March 17, 1981), a decision by petitioners to repudiate the agreement during this interim period could not possibly have worked a fraud on the Phillipses. Hence, by pleading the statute of frauds, petitioners could have successfully defended any claim the Phillipses might further have had to a share of the $339,900 sales proceeds. We thus find further support for the proposition that petitioners had unrestricted dominion over the entire sales proceeds during the 11 day period in March 1981. [13]
*337 Petitioners additionally argue that, in any event, their intent was to bring about an exchange and that this intent should be controlling. In Garcia v. Commissioner,80 T.C. 491, 498 (1983), we stated that in like-kind exchange cases "stated intent has received deference where parties have acted consistently therewith." Here, although petitioners' stated intentions may have been to effectuate an exchange, their actions reveal that, in fact, a cash sale and reinvestment took place. We accordingly conclude that petitioners must recognize the entire $309,000 gain (before the section 1202 deduction) on the sale of the 309-acre tract. [14]
We have considered various other arguments propounded by petitioners and find them to be meritless. Based on the foregoing, as well as concessions by both parties, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. The record does not reveal the exact date the Contract was signed by petitioners.↩
3. The record does not reveal the exact date the agreement was reached. ↩
4. Mr. Phillips determined that the 220-acre tract was worth roughly $121,000. Using this value and the Commission's value of $1,100 per acre for petitioners' land he arrived at about 109 acres as the amount of land he wanted to acquire from petitioners.↩
5. Petitioner described the "deep freeze" as a freezer used for storing food that he also used for storing documents because of its ability to withstand fire.↩
6. Petitioners, however, did not make a similar allocation of their cost basis to the 200 acres; instead, they used their entire cost basis for the whole 309-acre tract.↩
7. The parties agree that there was here no condemnation or threat of condemnation by the Commission; thus sec. 1033 is not applicable.↩
8. See also Young v. Commissioner,T.C. Memo. 1985-221; Anderson v. Commissioner,T.C. Memo. 1985-205; D'Onofrio v. Commissioner,T.C. Memo. 1983-632; Allen v. Commissioner,T.C. Memo. 1982-188; Milbrew, Inc. v. Commissioner,T.C. Memo. 1981-610, affd. on other issues 710 F.2d 1302↩ (7th Cir. 1983).
9. The sales proceeds were not, for example, placed in an escrow account, nor was any other method employed to ensure that a portion of the funds would be used to acquire like-kind property. Cf. Garcia v. Commissioner,80 T.C. 491 (1983). Placing the check in the deep freeze may have shielded it from the heat of fire but this act did not shield the check from petitioners' ability to cash it and use the proceeds as they pleased. We find additional support in petitioner's own admissions at trial: Q When you received the check from the State of Missouri for $339,900 on March 6 of 1981, you put it in your deep freeze. Could you have negotiated and endorsed the check? A I could have yes, but it wasn't mine. Q But you could have negotiated and endorsed the check because it was made payable to you and your wife and only your [sic] and your wife? A That is right.↩
10. The burden of proof is on petitioners. Welch v. Helvering,290 U.S. 111, 115↩ (1933). 11. We must look to state law in determining the nature of the legal interest petitioners had in the property. Aquilino v. United States,363 U.S. 509, 512-513 (1960); Morgan v. Commissioner,309 U.S. 78, 80 (1940). The relevant provision, Mo. Ann. Stat. sec. 432.010 (Vernon 1986), requires in part that: No action shall be brought * * * upon any contract made for the sale of lands unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith. * * *↩
12. See also Collins v. Horrell,219 Mo. 279, 118 S.W. 432, 441 (1908); Morris v. Pike,545 S.W.2d 410, 413↩ (Mo. Ct. App. 1967). 13. We note two other potential flaws in petitioners' statute of frauds argument. First, to effectively convey property held in the form of tenants by the entirety both owners must agree to the transfer. Austin & Bass Builders, Inc. v. Lewis,359 S.W.2d 711, 714 (Mo. Ct. App. 1962). Here, although petitioners owned the 309-acre tract in such a fashion, they have not shown that Mrs. Nixon was at all a part of the oral agreement between petitioner and Mr. Phillips. Second, the terms of a contract must be clear and definite in order for it to be enforced. Carr v. Redford,678 S.W.2d 3, 5 (Mo. Ct. App. 1984); Morris v. Pike,supra.↩Here, the terms of the oral agreement were unclear. The nature of the acreage to be acquired was not divulged (e.g., did the Phillipses acquire a specific 109-acre parcel or an undivided interest in the entire tract) nor was there disclosure of the nature of the title to be acquired. These facts create additional uncertainty as to whether the agreement would be enforceable by a Missouri court.
14. At trial, petitioners conceded that the numerical calculation of the gain on the disposition of the property as originally reported on the return was incorrect, and that respondent's method is correct, if he is sustained herein.↩